No. 22.597.

SAMUEL TURNER and BIRDIE TURNER, *Appellees*, v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

1. NEGLIGENCE—*Railroad Crossing—Obstructions—Pleadings—Rulings of Court*   It was not error to receive testimony under the petition, to overrule the demurrer to the plaintiffs' evidence, or to refuse the defendant's request for an instructed verdict.

2. SAME—*Instruction—"Stop, Look and Listen."*   An instruction touching the duty of the driver of the vehicle in respect to stopping, looking, and listening, held proper.

3. SAME.   Certain instructions were properly refused because substantially included in those given by the court.

4. SAME.   A charge touching the lateness of the train which it is alleged struck the plantiff's daughter, held proper.

5. SAME—*Condition of Crossing—Findings.*   The findings as to the condition of the crossing and the striking of the plaintiffs' daughter by the train, held to have been supported by the evidence.

6. SAME—*Rejected Evidence—Requested Instructions Refused*   The refusal to receive in evidence the speed ordinance offered by the plaintiffs, and the refusal of the plaintiffs' requested instruction as to wantonness and last clear chance, held not to constitute material error.

7. SAME—*Contributory Negligence Fatal to Recovery.*   Under the settled rule that one cannot recover for an injury caused by his own carelessness, the plaintiffs are barred because the driver crossed the track without stopping to ascertain whether or not a train was approaching.

Appeal from Cherokee district court; FRANK W. BOSS, judge. Opinion filed April 10, 1920. Reversed.

*R. R. Vermillion,* and *W. F. Lilleston,* both of Wichita, for the appellant; *W. F. Evans,* of St. Louis, Mo., of counsel.

*R. E. Rosenstein,* of Baxter Springs, *Paul MacCaskill,* and *Charles Stephens,* both of Columbus, for the appellees.

The opinion of the court was delivered by

WEST, J.: The plaintiffs, Samuel Turner and Birdie Turner, recovered a judgment for $2,000 for the alleged negligent killing of their daughter, Geraldine. The defendant appeals, and

assigns as error the overruling of an objection to the introduction of evidence under the petition, admitting incompetent evidence, overruling a demurrer to the plaintiffs' evidence, giving and refusing certain instructions, refusing to require the jury to retire and answer a certain question, and denying a new trial.

The plaintiffs in a cross appeal complain of rulings sustaining an objection to a speed ordinance offered by the plaintiffs, and refusing an instruction touching the claim of wantonness and the doctrine of last clear chance.

The injury occurred on South street in Baxter Springs, which street, running east and west, is crossed at right angles by the defendant's main track and a switch track located a few feet east thereof. The crossing was about thirty-three feet wide, and there was much traffic along the street to and from the Pitcher mining region to the west. The defendant's southbound passenger train, due about 7:30 a. m., came through about 8:30 a. m. The plaintiffs lived a short distance east of the crossing where they could see trains passing, and were familiar with the location where the injury occurred.

The petition alleged in substance that the sidetrack was about ten feet east of the main track and parallel with it for several hundred feet north of the crossing; that northeast of the crossing there was a large building about eight feet east of the side track, so that freight cars standing thereon were within about six and a half feet of the main line; that on the 7th of July, 1917, the defendant negligently left standing on this side line a string of freight cars. It was further averred that on this date the crossing was negligently maintained in a rough and irregular condition, and that by reason of the box cars on the sidetrack just west of the building already referred to persons riding in vehicles crossing to the west on the north side of the crossing could not see north along the main track until such vehicles were practically over it; that the defendant negligently failed to keep a watchman or any system of signals to warn persons approaching the crossing from the east of the approach of trains from the north; that it was the defendant's duty to keep an automatic signal system or a watchman there and to keep its sidetrack west of the building clear of cars; that on July 7, 1917, the city attorney had notified the superin--

tendent of the defendant company of the dangerous condition
of the crossing, without result.  It was alleged also that Baxter
Springs had in force an ordinance limiting the speed of trains
within the city to six miles an hour, and that for more than a
year the company had followed the practice of running its
southbound train at a rate of speed not exceeding six miles
an hour, and that this practice was notorious and known to the
plaintiffs.  It was charged that on July 7, 1917, the plaintiff
Birdie Turner was driving along South street in a one-horse
spring wagon, sitting on the south end of the seat, Geraldine
sitting on the north end, and behind them a Mrs. Cox was
sitting on a sack of bran; that Birdie Turner could not see any
part of the main line because her view was shut off by the build-
ing and the defendant's freight cars on the sidetrack, and trees
and bushes and other buildings north of the building; that she
was in full control of the horse and listening and looking for
any train that might be coming, but no whistle or bell was
sounded or other warning given, and that when she reached
a point where she could see north up the main track her horse
was thereon, at which time she saw a train about 100 feet north
of the crossing coming at about 25 miles an hour; that at this
moment the employees in charge of the train saw her rig in
peril, or by the exercise of ordinary care could have so seen,
but failed to apply the brakes and reverse the engine as they
could and should have done.  She alleged that it was impossible
to back her horse off the crossing in time to avoid the collision,
and the only safe way was to strike him with the lines and
hasten his speed, which she did, the rig thereby being missed
by the train by three or four inches; that Geraldine was thrown
back over the seat in such a way that she rolled out of the
vehicle and "was struck on the head by some portion of the
west rail of said locomotive," from which falling and stroke
she sustained internal injuries and her head was crushed and
otherwise so injured that she did not regain consciousness,
but died within two hours.

The answer consisted of a general denial and an allegation
of contributory negligence of Geraldine and Birdie Turner.

With their general verdict the jury returned answers to a
number of questions to the effect that there was no evidence to

show whether or not Geraldine looked to ascertain that an engine or cars were approaching; that the occupants of the wagon did not stop to ascertain whether it was safe to proceed; that if Birdie Turner had looked up the main track the box car was there to obstruct her view even if she had so looked when within 12 feet of the main track, and such occupants could not have seen smoke from the approaching engine if they had looked before driving on the main-line track, and that the sidetrack was seven and one-half feet east of the main track at the north side of the crossing—

"2. Do you find that the view of Birdie Turner and Geraldine Turner was obstructed until such time as they were in a position of peril known to defendants. Ans. Yes.

"3. Do you find that, under all the facts and circumstances, the defendant company was, on July 7th, 1917, negligent in running its train at the rate of speed it was running? Ans. Yes.

"4. Do you find that the defendant company, under all the facts and circumstances, was, on July 7th, 1917, negligent in running its train at the speed it was running without having a watchman at said crossing to warn and inform plaintiff and said Geraldine Turner of any danger. Ans. Yes.

"5. Do you find that the roadway was more or less rough and irregular on that crossing at the sides of the plank across the roadway? Ans. Yes.

.      .     .      .       .         .       .       .       .     .     .

"Q. 10. What, if anything, was there to prevent Birdie Turner or Geraldine Turner from hearing the approaching engine and cars, if they had stopped and listened therefor before driving on the main-line track? Ans. Buildings, box cars and amount of traffic.

"Q. 11. On the occasion in question, was it reasonably necessary, before driving on the main track, to stop the wagon in question, in order to ascertain whether an engine or cars were approaching on said track from the north? Ans. No.

"Q. 4. On the occasion in question, did the engineer apply the brakes as he saw said wagon crossing the main line? Ans. Yes.

.      .     .      .       .         .       .       .       .     .     .

"Q. 3. If you return a verdict against defendant, please state upon what grounds of negligence, if any, you base your verdict? Ans. On grounds of obstructions and speed of approaching train and rough crossing; no flagman at crossing.

.      .     .      .       .         .       .       .       .     .     .

"Q. 8. Did any part of the engine or train strike Geraldine Turner on the occasion in question? Ans. Yes."

The overruling of the objection to the introduction of evidence under the petition is not argued in counsel's brief and need not be discussed.

It was not error to overrule the demurrer to the plaintiffs' evidence, but it would have been error to sustain it.

Neither was it error to refuse the defendant's request for an instructed verdict.

Some complaint is made that certain issues covered by the pleadings were submitted to the jury, but no error in this respect appears to have been committed.

The jury were charged that it was. the duty of the driver before going on the track to look and listen for approaching cars, and if there were obstructions to her view greater vigilance on her part was required, and if they were such as to make it necessary in the exercise of reasonable and ordinary care to stop before going on the track to see if a train was approaching it was her duty to do so, and failure would be contributory negligence; also, that if the defendant failed to give any warning this would not relieve the driver from such duty to look and listen, and if she and her daughter did look and listen at the place where a train could not be seen this would not excuse them from looking at a point where it could be seen, and if they failed to look and listen, having reached the point where the train could have been seen and heard, and took no reasonable precaution the plaintiffs could not recover. Counsel argue that this coupling of these instructions raised the implication that the failure to give warning would relieve the driver from the duty of stopping, and it is said that this made more necessary the instruction requested and refused, to the effect that such warning would not excuse the failure to look and listen, and made it necessary to stop. But these instructions taken together were not hard to understand, and they stated the rule of law applicable in a way that could not reasonably have misled the jury.

Another instruction offered and refused simply covered the same ground, and its refusal was not error.

The defendant requested an instruction touching the proximate cause of the injury, which was denied, but one was given by the court which was fully as clear and correct, and hence the refusal was not error.

The defendant asked the court to charge that it was immaterial whether the train was late or on time as persons approaching a railroad crossing must act upon the assumption that trains and cars may appear at any time. This was refused, but the jury were told that a railroad track is a sign of danger and under the law and pleadings it was the duty of the driver, before going on the tracks, to look and listen for the approach of trains and cars on each track, and if ordinary care required, also to stop in order to ascertain whether a train was approaching. This sufficiently covered the point, the train in question having been about an hour late.

Fault is found with the court's refusal to charge that the speed of the train was a proximate cause of the injury, but as the facts were before the jury and they were given the proper instructions as to what constituted proximate cause, this refusal was correct.

The four grounds of negligence on which the jury based their verdict—obstructions, rough crossing, speed, and lack of flagman—are said by counsel not to have been the proximate cause of the injury. They insist that it was the sight, and not the speed of the train, that caused the driver to hurry the horse and thus throw the girl out; that from the driver's own evidence the rough crossing had nothing to do with the accident; that the absence of the flagman was a condition and not a cause; and that the freight car was presumably where it was rightfully. It is suggested that among the obstructions the jury included the Murdock warehouse. We find no cause for imputing to the jury a disposition to hold the company blamable for the location of the Murdock warehouse. Birdie Turner's own evidence touching the rough crossing was on this wise:

"Q. Now did you thereafter observe whether or not the driveway on that portion was rough and irregular? A. Yes, sir, it was a little rough.

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. What, if any, change did you find in the condition following that time, of the crossing itself? . . . A. Since then I see they have put in more tracks and made it more smooth; put in more boards."

In addition to this, Sheriff Frazier testified that there was much travel in the morning and evening going to and from work in taxicabs and trucks—

Turner v. Railway Co.

"I have seen them piled up there at the crossing and have waited for the rigs and trucks to get out of the way, but never over 10 minutes. . . . That was rougher than the usual crossing. What caused that was the heavy trucks; so many trucks going over would dig the crossing out and make it holey, that was the condition on July 7, 1917."

### On cross-examination he said:

"Q. You remember any boards being cut out?  A.  I remember that crossing being rough because I crossed it so many times."

So it will not do to say that the very mild finding as to the roughness of the crossing was not supported by the evidence.

Neither can it be said that the jury should have found that the girl was not struck by the train, or that their finding that she was hit was contrary to or not sustained by the evidence. It seemed to be claimed on oral argument that she was not hit at all.  A large active girl of fourteen by simply falling from a wagon like the one in question would not be likely to receive fatal injuries.  Jack Brashear testified that the rig went over the north side of the road and he saw the driver slap the lines to hurry across the track and he saw the girl just as she hit the ground.

"She hit pretty close to the west rail of the main line. I was about 50 or 75 feet from there at the time, on my load of lumber. As the train passed the girl was lying about the middle of the road, a little beyond— south of where she had fallen, in a low place cut out by wheels, in the traveled portion of the road. . . . I went over to the girl; she was bleeding out of her nose and mouth—unconscious."

### On cross-examination he said:

"A. I did not see her hit.

"Q. You did not see her hit?  A.  But.I noticed her just before the train passed over and I noticed her tumble out. . . . She tumbled out on the north side of the wagon."

Birdie Turner testified that the girl was doing nothing except sitting by her until she rolled out—

"And when I got back there she was lying on the south side of the traveled way quite a ways west of the main-line track, about 12 or 13 feet west of the main-line track, bleeding in the mouth and nose, unconscious.  She died in about two hours."

### Hal Hardman testified:

"I went down to where Geraldine Turner was lying unconscious bleeding at the mouth and ears, on the south side of the traveled way."

Ross White:

"The girl was lying pretty much toward the south side of the road. The used portion was about 20 feet wide and she was on the south side. I believe she was a little ways off the traveled portion. . . . She was bleeding at the mouth, nose and one ear, and unconscious."

Porter Clark, undertaker:

"She had been struck by something in the abdomen and side of the head."

E. F. Allard:

"She was lying west of the main-line track something about like 7 or 8 feet tolerably close to the south side of the traveled way, I judge 5 or 6 feet from the embankment."

The answer to question 10, to the effect that buildings, box car and amount of traffic would have prevented hearing the approaching train if the driver and her daughter had stopped and listened, is justly criticized as disingenuous and groundless. It is also said that the answer to question 11, that it was not necessary to stop in order to ascertain whether a train was approaching, is contrary to the preceding answer. It may be said that one had to do with hearing, while the other involved both hearing and seeing. At any rate, if the obstruction and traffic were in fact such that to stop and listen would have been without avail it would follow that it was not necessary to stop for that purpose, for as said in *Edwards v. Railway Co.*, 90 Kan. 499, 135 Pac. 562, the plaintiff and her daughter were not required to listen for something they could not hear.

It is finally argued that under the decisions in *Palmer v. Railway Co.*, 90 Kan. 57, 60 Pac. 736, *Wehe v. Railway Co.*, 97 Kan. 794, 156 Pac. 742, and *Williams v. Electric Railroad Co.*, 102 Kan. 268, 170 Pac. 397, finding No. 5, that the occupants of the wagon did not stop to ascertain whether it was safe to proceed before the wagon got on the main track, makes a recovery impossible. In the Palmer case there were eight tracks about thirteen feet apart and cars standing on all but the main track. Palmer, coming west, crossed six sidetracks before reaching the main track, his view to the north being completely obstructed by box cars. The southbound train coming six to eight miles an hour struck his wagon on the main track, after he had driven his team over it without stopping, looking, or listening. He was held to have been injured as the

Turner v. Railway Co.

result of his own carelessness. In the Wehe case the driver approached the track at a place where he could not see along it until his car was where it would be struck, and he did not stop to see whether or not there was any danger, although he did listen for a train. He was held required as a matter of law to stop his car before driving it upon the track. In *Williams v. Electric Railroad Co.* it was declared in the syllabus that where obstructions to his view prevent one about to cross a railroad track from otherwise ascertaining the fact of safety, then it is his duty to stop to make sure of his safety before crossing. The facts before us do not exactly fit either of these decisions. Here the rig and the daughter were all over the track safe and sound, but just as the wagon cleared the main track the girl fell and met her death. Grant that the obstruction did no harm because no one tried to look north, and that the speed of the car failed to impel it swiftly enough to strike the driver or the rig, still the findings supported by the evidence present a condition out of which a death arose, and clearly somebody was negligent.

All the logic, reasoning and refinement which mark the discussions and define the law amount simply to this: That one party cannot hold the other responsible for an injury which his own carelessness has alone, or with the other's, caused. Usually, the question of contributory negligence is one of fact for the jury, and so run scores of our own decisions. It is only when the court, having all the facts before it, which it can see the same and as well as the jury, that it becomes a matter of law, and then only when it must be judicially said that following proper legal rules reasonable men would not fairly differ as to the proper conclusion to be reached.

"It is only when the court does not know all the facts as well as the jury, or, if knowing all of them, different minds might deduce different conclusions, that the question of a traveler's obligation to stop at a highway-crossing belongs exclusively to the jury, . . . and knowing the facts as the jury knew them we believe all reasonable minds, if guided by correct legal rules, would arrive at the same conclusion." (*Railroad Co. v. Willey,* 60 Kan. 819, 823, 58 Pac. 472.)

Of course, if the jurors' minds are not guided by correct legal rules they act capriciously or unguided, and therefore in an improper manner. In *Railroad Co. v. Brock,* 64 Kan. 90, 67

Pac. 538, it was said that there may be cases in which none of the evidence tends to show that it would have been the part of wise caution to stop, and that there are occasionally cases in which the evidence proves without doubt that the traveler should have stopped, and—

"In the latter class the obligation to stop must be declared as a matter of law by the court." (p. 92.)

In *Williams v. Electric Railroad Co.,* supra, it was declared, in paragraph 2 of the syllabus, of one about to cross a railroad track:

"But where obstructions to his view prevent him from otherwise ascertaining the fact of safety, then it is his duty to stop to make sure of his safety before crossing."

In *Adams v. Railway Co.,* 93 Kan. 475, 144 Pac. 999, the driver of the vehicle could not see the approaching train because of obstructions with which he was familiar, and which also prevented him from hearing it. In addition to this he had his ears muffled, and it was said that in that situation, and knowing the crossing to be dangerous, he simply took chances and drove upon the crossing when a halt to look and listen would have saved him. It was said:

"This court has before it facts which enable it to know the situation of the plaintiff at the time of the injury as well as the jury knew it, and knowing the facts as well as the jury knew them, the court concludes that reasonable minds guided by correct rules of law would reach the conclusion that the plaintiff ought to have stopped to look or listen, or both, before driving upon the track." (p. 478.)

Here we have facts, the scene of the accident and the circumstances before us the same as the jury had them. Assuming that the fall from the wagon was caused by the roughness of the crossing, which was the result of the defendant's negligence, it is perfectly plain that the driver, without stopping, came by an obstruction which made it dangerous to approach the track without stopping, and seeing the train coming, speeded up the horse, and had she stopped before approaching this place, well known to her to be dangerous, the injury would not have occurred. There are present, therefore, two cases of negligence—one of the defendant, and the other of the driver—without either of which no harm could have been done, but by the coupling of which the injury and death occurred. Persons who take chances in driving upon railroad

crossings under such circumstances must, under the settled rules of law, be left without redress, for otherwise they would be recovering damages caused by their own carelessness. It follows, therefore, that the judgment must be reversed.

The refusal to receive in evidence the speed ordinance, whether right or wrong, was not materially prejudicial, for its admission would still have left the driver's negligence a complete bar to recovery.

The requested instruction as to wantonness and last clear chance was properly refused, first, because neither of these elements was pleaded, and second, because the evidence did not fairly tend to show either wantonness or circumstances making applicable the doctrine of last clear chance.

The judgment is reversed with directions to enter judgment for the defendant.